IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| ROBERT ARMOR, | : | CIVIL ACTION NO. |
| | : | 1:12-CV-2719-TWT-JSA |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| F E D E R A L   E X P R E S S | : | **F I N A L   R E P O R T   A N D** |
| CORPORATION, | : | **RECOMMENDATION   ON   A** |
| | : | **M O T I O N   F O R   S U M M A R Y** |
| Defendant. | : | **JUDGMENT** |

Plaintiff Robert Armor filed the Complaint [1] that initiated this case on August 7, 2012, followed by an Amended Complaint [6] on November 6, 2012. Plaintiff alleges that Defendant terminated him based on racial discrimination. He has asserted claims against Defendant for discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, *et seq*., and 42 U.S.C. § 1981 ("Section 1981").

The case is now before the Court on the Defendant's Motion for Summary Judgment [46]. For the reasons discussed below, the undersigned **RECOMMENDS** that Defendant's Motion [46] be **GRANTED**, and that judgment be entered in favor of Defendant on all four of Plaintiff's claims.

## I.    FACTS

Unless otherwise indicated, the Court draws the following facts from Defendant's Statement of Undisputed Material Facts in support of its Motion for Summary Judgment [46-1] ("Def. SOMF"); Plaintiff's Response [47-2] thereto; Plaintiff's Statement of Material Facts [47-3]; and Defendant's Response [50] thereto.

The Court has excluded assertions of fact that are immaterial or presented as arguments or legal conclusions, and has excluded assertions of fact unsupported by a citation to evidence in the record or asserted only in the brief and not the statement of facts. *See* LR 56.1B, NDGa ("The court will not consider any fact: (a) not supported by a citation to evidence . . . or (d) set out only in the brief and not in the movant's [or respondent's] statement of undisputed facts."). The Court has also viewed all evidence and factual inferences in the light most favorable to Plaintiff, as required on a defendant's motion for summary judgment. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *McCabe v. Sharrett*, 12 F.3d 1558, 1560 (11th Cir. 1994); *Reynolds v. Bridgestone/Firestone, Inc.*, 989 F.2d 465, 469 (11th Cir. 1993). Accordingly, the following facts are viewed in the light most favorable to Plaintiff:

Plaintiff Robert Armor ("Armor"), who is African-American, began working for FedEx in 1999 as a Manager of Aircraft Line Maintenance. Def. SOMF [46-1] ¶ 1. Armor served as an aircraft maintenance manager for FedEx until December 2006, when he assumed the position of Manager of Field Line Maintenance. *Id*. ¶ 2. In this capacity, Armor was responsible for supervising FedEx employees and vendors who performed aircraft maintenance at several FedEx ramp locations in the southeastern United States, including New Orleans, Louisiana and Mobile, Alabama. *Id*. ¶ 3. It was Armor's duty to be aware of the work and flight schedules at the FedEx ramps he managed. *Id*. ¶ 4.

As a FedEx employee, Armor received several copies of FedEx's Employee Handbook and policies from FedEx's People Manual, which governed his employment at FedEx. *Id*. ¶ 5. As a manager in FedEx's Aircraft Maintenance Department, Armor also received copies of FedEx's Aircraft Maintenance Handbook and Aircraft Maintenance Administrative Manual, as well as training on the policies contained in those manuals, including employee time cards and the Meteor time clock system. *Id*. ¶ 6. As a FedEx manager, Armor was required to become familiar with, and to follow, the policies and procedures in FedEx's People Manual and Aircraft Maintenance Administrative Manual. *Id*. ¶ 7. During his employment, Armor also became familiar with FedEx's Acceptable Conduct Policy, which stated that he could

be disciplined and/or discharged for misconduct, including falsification of company documents and leadership failure. Def. SOMF [46-1] ¶ 8.

FedEx's Time Card Policy required its employees to perform all time card-related activities on his or her own time card, including the recording of start and stop times, and it warned that completion of a time card by another employee and/or falsification of a time card was a serious offense that may result in termination. *Id*. ¶ 9. It was Armor's duty as a manager to review each of his employees' time cards to verify that the time submitted on that card matched the employee's work schedule and that it accurately reflected the hours worked by the employee before he approved the time card for payment. *Id*. ¶ 10. If there were any inaccuracies or inconsistencies in the hours or schedule reflected on the employee's time card, it was Armor's duty to get an exception form from the employee to explain the inaccuracies or inconsistencies so that Armor could verify the hours on the time card were accurate and actually worked by the employee. *Id*. ¶ 11.

Armor was also familiar with FedEx's Business Travel & Entertainment Policy, which required employees to submit an expense report form to be reimbursed by FedEx for reasonable expenses incurred during authorized travel conducted for the company. *Id*. ¶ 12. Armor followed the Business Travel & Entertainment policy to submit his own expense reports to FedEx for reimbursement and, as a manager, he

was responsible for reviewing and approving business travel expense reports that his employees submitted. *Id*. ¶ 13.

In February 2009, Armor terminated FedEx's service contract with Pegasus Aircraft Maintenance ("Pegasus"), a company that provided mechanics for the maintenance of FedEx aircraft at two ramps that Armor managed. *Id*. ¶ 14. A few weeks later, Armor learned that FedEx was investigating a complaint from Pegasus that Armor had engaged in improper communications with a Pegasus employee. Def. SOMF [46-1] ¶ 15. In late April 2009, Armor complained to FedEx that a Pegasus executive had sent him a text message containing a racial slur. *Id*. ¶ 16.

In separate interviews conducted with Armor about his complaint, FedEx Human Resource Advisor Peggy Langford ("Langford") and Managing Director Scott Ogden ("Ogden") both asked Armor what he thought the message from Pegasus meant. *Id*. ¶ 17. On May 4, 2009, Armor filed an internal complaint of race discrimination under FedEx's EEO Complaint Process, alleging that Ogden made "racially insulting" statements during his interview with Armor by asking Armor about the ethnicity of the Pegasus executive who sent the text message and if Armor thought "it was okay [for the Pegasus executive] to use the 'N word' to communicate with [Armor] because of an understanding that it might be okay under some instances for people to communicate in this fashion." *Id*. ¶ 18.

Langford and Lee Harris ("Harris"), a Managing Director in FedEx's International Aircraft Line Maintenance department, conducted a formal investigation into Armor's discrimination complaint, but Harris concluded that Ogden had not violated policy and that Armor's allegation of discrimination could not be substantiated. *Id*. ¶ 19. FedEx did not discipline Armor at the conclusion of its investigation of Pegasus' complaint about Armor. *Id*. ¶ 20.

Approximately seven months later, in December 2009, Richard Ugarte ("Ugarte") became Armor's indirect supervisor when he replaced Ogden as Managing Director of Line Maintenance for FedEx's Eastern Region. *Id*. ¶ 21. In mid-February 2010, Armor began reporting to a new direct supervisor, Adam Christopher ("Christopher"), whom Ugarte hired as Senior Manager of Field Line Maintenance. Def. SOMF [46-1] ¶ 22.

As a result of an anonymous complaint, on March 29, 2010, Armor fired one of his employees at the New Orleans ramp, Senior Aircraft Maintenance Technician Andrew Herr ("Herr"), for falsifying his time card in violation of FedEx's Acceptable Conduct Policy. *Id*. ¶ 24. Specifically, Herr was terminated for violating Defendant's timesheet policy by leaving his shift without clocking out in at least four prior instances. Pl. SOMF [47-3] ¶ 8.

During Herr's appeal of his termination under FedEx's Guaranteed Fair Treatment ("GFT") Procedure, Herr reported to FedEx that Armor had falsified company documents, including Herr's time cards related to a business trip to Mobile, Alabama. Def. SOMF [46-1] ¶ 25. Herr alleged that Armor inflated the work hours on Herr's time cards so that he could reimburse Herr for his travel expenses with overtime pay, rather than going to the trouble of preparing and submitting the reimbursement request form and supporting documentation that FedEx's Travel and Entertainment Policy required. *Id*. ¶ 26.

In support of his allegation, Herr provided FedEx with an invoice for a hotel stay in Mobile that had not been submitted for reimbursement on a travel expense report to FedEx. *Id*. ¶ 27. Christopher, Armor's direct supervisor, suspended Armor with pay while he investigated Herr's allegation of misconduct by interviewing Herr and Armor and reviewing company records, including policies, schedules, and time cards. *Id*. ¶ 28. Herr was eventually reinstated. Pl. SOMF [47-3] ¶ 14.

Armor asked Herr to travel from his home in New Orleans, Louisiana to work on his scheduled days-off at the FedEx ramp in Mobile, Alabama. Def. SOMF [46-1] ¶ 33. At time of this request, Armor knew which dates Herr needed to work in Mobile. *Id*. ¶ 34. Armor entered into FedEx's time card system the hours he estimated Herr might have worked at Mobile on September 11, 12, and 13, 2009. *Id*. ¶ 35; *see also*

7

Pl. SOMF [47-3] ¶ 6 ("Plaintiff entered estimated hours for Mr. Herr . . ."). Armor was familiar with Herr's work schedule, and he could have checked that schedule and the flight schedule for the Mobile ramp to verify that Herr actually worked 26 hours of overtime on September 11, 2009 and September 12, 2009, and 13 hours (including three hours of overtime) on September 13, 2009. *Id*. ¶ 36. Armor approved Herr's time cards for September 11, 12 and 13, 2009 without verifying that the hours he entered for Herr into the time card system accurately reflected the hours that Herr actually worked in Mobile. *Id*. ¶ 37.

Upon his return from Mobile, Herr submitted a reimbursement request to Armor for the mileage he incurred in driving one round-trip between New Orleans and Mobile. *Id*. ¶ 38. Herr did not submit a reimbursement report for expenses he incurred during his trip to Mobile, nor did Armor ask Herr for one. *Id*. ¶ 39. As a result of Armor entering and approving inflated and inaccurate work hours for Herr for September 11, 12, and 13, 2009, Armor overpaid Herr by several hundred dollars. Def. SOMF [46-1] ¶ 40.

Based on these interviews and records, Christopher concluded that Armor had deliberately misrepresented Herr's work hours on his time cards so that Armor could pay Herr for travel expenses and avoid submitting the reimbursement request forms and documentation that FedEx policy required. *Id*. ¶ 29. With the concurrence of

Langford and Ugarte, Christopher decided to terminate Armor's employment for falsification of an employee's time card and for leadership failure, both violations of FedEx's Acceptable Conduct Policy. *Id*. ¶ 30.

Because Christopher was on vacation, Ugarte met with Armor on May 27, 2010 to terminate Armor's employment. *Id*. ¶ 31; *see also* Pl. SOMF [47-3] ¶ 12 ("Mr. Ugarte delivered Mr. Armor's termination letter . . ."). Armor contested his termination through all steps of FedEx's Guaranteed Fair Treatment ("GFT") Procedure and its EEO Complaint Process, but his termination was upheld by three levels of upper management. *Id*. ¶ 32; *see also* Pl. SOMF [47-3] ¶ 14 ("Mr. Herr was reinstated shortly after his termination while Plaintiff was not . . .").

Armor believes that Ugarte made or drove the decision to terminate his employment. *Id*. ¶ 41. Armor believes Ugarte had a personal bias against him, but he does not know why, so Armor assumes it was based on race. *Id*. ¶ 42. Armor also believes that Ugarte knew about his discrimination complaint, but Armor does not know this for a fact, and Ugarte was not in Armor's direct line of management at the time Armor made the complaint. Def. SOMF [46-1] ¶ 43.

Armor does not believe that Christopher and Langford discriminated against him because of his race or that they retaliated against him for complaining of discrimination. *Id*. ¶ 44. Armor thinks that FedEx should have disciplined him with

a warning letter, instead of termination, because this was the first time he had been disciplined for misconduct at FedEx. *Id*. ¶ 45.[1]

## II.   DISCUSSION

### A.   SUMMARY JUDGMENT STANDARD

Summary judgment is authorized when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact. *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 175 (1970); *Bingham, Ltd. v. United States*, 724 F.2d 921, 924 (11th Cir. 1984). The movant carries this burden by showing the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In making its determination, the court must view the evidence and all factual inferences in the light most favorable to the nonmoving party.

---

[1] Plaintiff produces evidence of other employees or former employees of FedEx outside of Plaintiff's protected class (including Herr), who were disciplined less severely than he was for what Plaintiff argues was similar misconduct. These facts are discussed in detail in the discussion below.

Once the moving party has adequately supported its motion, the nonmoving party must come forward with specific facts that demonstrate the existence of a genuine issue for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The nonmoving party is required "to go beyond the pleadings" and to present competent evidence designating "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. Generally, "[t]he mere existence of a scintilla of evidence" supporting the nonmoving party's case is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

When considering motions for summary judgment, the court does not make decisions as to the merits of disputed factual issues. *See Anderson*, 477 U.S. at 249; *Ryder Int'l Corp. v. First Am. Nat'l Bank*, 943 F.2d 1521, 1523 (11th Cir. 1991). Rather, the court only determines whether there are genuine issues of material fact to be tried. Applicable substantive law identifies those facts that are material and those that are irrelevant. *See Anderson*, 477 U.S. at 248. Disputed facts that do not resolve or affect the outcome of a suit will not properly preclude the entry of summary judgment. *See id.*

11

If a fact is found to be material, the court must also consider the genuineness of the alleged factual dispute. *See id.* An issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is "merely colorable" or is "not significantly probative." *Id.* at 250. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 242. Moreover, for factual issues to be genuine, they must have a real basis in the record. *See Matsushita*, 475 U.S. at 587. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* at 587 (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)). Thus, the standard for summary judgment mirrors that for a directed verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 259.

B.     COUNT II: RACE DISCRIMINATION IN VIOLATION OF TITLE VII

1.     Legal Standard

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . ." 42 U.S.C. § 2000e-2(a)(1). To prevail on a Title VII claim, a plaintiff must prove that the defendant acted with discriminatory intent. *See Hawkins v. Ceco Corp.*, 883 F.2d 977, 980-981 (11th Cir. 1989); *Clark v. Huntsville City Bd. of Educ.*, 717 F.2d 525, 529 (11th Cir. 1983). Such discriminatory intent may be established either by direct evidence, or by circumstantial evidence meeting the four-pronged test set out for Title VII cases in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Holifield v. Reno*, 115 F.3d 1555, 1561-62 (11th Cir. 1997); *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1184 (11th Cir. 1984).

a.     Direct Evidence

Direct evidence is defined as evidence "that is based on personal knowledge or observation and that, if true, proves a fact without inference or presumption." BLACK'S LAW DICTIONARY 596 (8th ed. 2004); *see also Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1226 (11th Cir. 1993); *Carter v. City of Miami*, 870 F.2d 578, 581-582

(11th Cir. 1989); *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1528 n.6 (11th Cir. 1987). Only the most blatant remarks whose intent could only be to discriminate constitute direct evidence. *See Clark*, 990 F.2d at 1226; *Carter*, 870 F.2d at 581. Evidence that only suggests discrimination, *see Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081-1082 (11th Cir. 1990), or that is subject to more than one interpretation, *see Harris v. Shelby Cnty. Bd. of Educ.*, 99 F.3d 1078, 1083 n.2 (11th Cir. 1996), does not constitute direct evidence. "[D]irect evidence relates to actions or statements of an employer reflecting a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee." *Caban-Wheeler v. Elsea*, 904 F.2d 1549, 1555 (11th Cir. 1990); *see also Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 641-642 (11th Cir. 1998).

b.    Circumstantial Evidence

Evidence that merely "suggests discrimination, leaving the trier of fact to infer discrimination based on the evidence" is, by definition, circumstantial. *Earley*, 907 F.2d at 1081-1082. Because direct evidence of discrimination is seldom available, Title VII plaintiffs must typically rely on circumstantial evidence to prove discriminatory intent using the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981). *See Holifield v. Reno*, 115 F.3d 1555, 1561-62 (11th Cir. 1997); *Combs*

14

*v. Plantation Patterns*, 106 F.3d 1519, 1527-1528 (11th Cir. 1997). Under this framework, a plaintiff is first required to create an inference of discriminatory intent, and thus carries the initial burden of establishing a *prima facie* case of discrimination. *See McDonnell Douglas*, 411 U.S. at 802; *see also Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d 1306, 1310, *reh'g denied and opinion superseded in part*, 151 F.3d 1321 (11th Cir. 1998); *Combs*, 106 F.3d at 1527.

Demonstrating a *prima facie* case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination. *See Jones*, 137 F.3d at 1310-1311; *Holifield*, 115 F.3d at 1562; *Burdine*, 450 U.S. at 253-54. Once the plaintiff establishes a *prima facie* case, the defendant must "articulate some legitimate, nondiscriminatory reason" for the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802; *Jones*, 137 F.3d at 1310. If the defendant is able to carry this burden and explain its rationale, the plaintiff, in order to prevail, must then show that the proffered reason is merely a pretext for discrimination. *See Burdine*, 450 U.S. at 253-54; *Perryman v. Johnson Prod. Co.*, 698 F.2d 1138, 1142 (11th Cir. 1983).

A *prima facie* case along with sufficient evidence to reject the employer's explanation is generally all that is needed to permit a finding of intentional discrimination. *See Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 148 (2000); *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993); *Combs*,

106 F.3d at 1529. However, summary judgment for the employer may still be appropriate in some circumstances, even if plaintiff produced evidence refuting the employer's proffered explanation, if the record "conclusively revealed [that] some other, nondiscriminatory reason" motivated the decision. *Alvarez v. Royal Atl., Inc.*, 610 F.3d 1253, 1264 (11th Cir. 2010) (citing *Reeves*, 530 U.S. at 148).

This *McDonnell Douglas-Burdine* proof structure "was never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983); *see also Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 594 (11th Cir. 1987). The Eleventh Circuit has held that this framework of shifting burdens of proof is a valuable tool for analyzing evidence in cases involving alleged disparate treatment, but the "framework is only a tool." *Nix*, 738 F.2d at 1184. The "ultimate question" is not whether a plaintiff has established a *prima facie* case or demonstrated pretext, but "whether the defendant intentionally discriminated against the plaintiff." *Id.* (quoting *Aikens*, 460 U.S. at 713-14); *see also Jones*, 137 F.3d at 1313. The plaintiff retains the ultimate burden of proving that the defendant is guilty of intentional discrimination. *See Burdine*, 450 U.S. at 253.

Under this framework, a plaintiff can generally establish a *prima facie* case of unlawful discrimination under Title VII by showing that: (1) he is a member of a protected class; (2) he was subjected to an adverse employment action by his employer; (3) he was qualified to do the job in question, and (4) his employer treated similarly-situated employees outside his protected classification (*i.e.*, those of a different sex or race) more favorably than it treated him. *See McDonnell Douglas*, 411 U.S. at 802; *see also Wright v. Southland Corp.*, 187 F.3d 1287, 1290 (11th Cir. 1999); *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).

2.      Analysis of Plaintiff's Title VII Claim

Plaintiff does not present direct evidence of discrimination. Plaintiff instead argues that he establishes a *prima facie* case of discrimination through circumstantial evidence. *See* Pl. Resp. [47-1] at 9. Defendant, in turn, concedes that Plaintiff has met the first three elements of his *prima facie* case. *See* Def. Brf. [46-2] at 3. The Court's adjudication of Defendant's Motion thus turns on (a) whether Plaintiff can satisfy the fourth prong of the *prima facie* test by pointing to evidence sufficient to support an inference of discrimination, and, even if so, (b) whether Plaintiff can point to evidence that Defendant's proffered non-discriminatory reasons for dismissal were pretextual.

a.   *Prima Facie* case

Plaintiff attempts to establish a *prima facie* case of discrimination by pointing to disparate treatment of comparator employees who allegedly also violated Defendant's expense reimbursement rules but who were not fired. "When evaluating an allegation of disparate treatment," courts "require that a comparator be similarly-situated to the plaintiff in all relevant respects." *Stone & Webster Constr. v. U.S. Dep't of Labor*, 684 F.3d 1127, 1135 (11th Cir. 2012) (internal quotations and citation omitted). Indeed, the comparator employee "must be nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004). Thus, "[t]he quantity and quality of the comparator's misconduct must be nearly identical." *Brown*, 401 F. App'x at 480 (internal quotations and citation omitted). "The most important factors in the disciplinary context are the nature of the offenses committed and the nature of the punishments imposed." *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999) (internal quotations and citation omitted).

"Even if a plaintiff and comparator are similar in some respects, differences in their overall record may render them not 'similarly situated' for purposes of establishing a prima facie case." *Brown v. Jacobs Eng'g, Inc.*, 401 F. App'x 478, 480 (11th Cir. 2010). For example, in *Knight v. Baptist Hospital of Miami, Inc.*, 330 F.3d

1313, 1316-1317 (11th Cir. 2003), the Eleventh Circuit affirmed a grant of summary judgment despite evidence that the African-American plaintiff was disciplined more harshly than a Caucasian co-worker who performed the same job and who committed similar infractions. The court found that the plaintiff failed to establish that the two employees were similarly-situated in all relevant respects because, despite similarity in their misconduct, the comparator's overall record was better. *See id.*

Courts thus examine proffered comparators in detail to ensure that any comparison is not "confusing apples with oranges." *Burke-Fowler v. Orange Cnty., Fla.*, 447 F.3d 1319, 1323 (11th Cir. 2006). *See, e.g., McCallister v. Hillsborough Cnty. Sheriff*, 211 F. App'x 883, 885-886 (11th Cir. 2006) (finding that individuals whom Plaintiff identified were not similarly-situated because Plaintiff broke six rules while individuals in question broke between one and three rules); *Greer v. Birmingham Beverage Co., Inc.*, 291 F. App'x 943, 946 (11th Cir. 2008) (finding that Plaintiff failed to identify similarly-situated individuals; coworkers Plaintiff identified were disciplined once for excessive cell phone usage, while Plaintiff was disciplined twice); *Roy v. Broward Sheriff's Office*, 160 F. App'x 873, 876 (11th Cir. 2005) (finding plaintiff, a terminated deputy sheriff, did not identify any similarly-situated individuals; closest potential comparator was not in uniform and riding in a private vehicle at time of incident in question, while plaintiff was in uniform and driving a

police car at time of incident leading to termination). Courts consider whether the proffered comparator had the same supervisor, *see Morris v. Potter*, 251 F. App'x 667, 668-669 (11th Cir. 2007), as well as the type of position the plaintiff holds and the content of the plaintiff's work. *See Simionescu v. Bd. of Tr. of the Univ. of Alabama*, 482 F. App'x 428, 430-431 (11th Cir. 2012) (finding that two university faculty members were not similarly-situated because one was not tenure-track, while plaintiff was, and second faculty member taught in a different department than did plaintiff). Finally, courts also consider whether the plaintiff and the proffered comparator were employed for similar periods and whether they had similar records of performance. *See Roy*, 160 F. App'x at 876 (finding that proffered comparator was not similarly-situated because comparator had been with department for sixteen years, while plaintiff had less than 18 months' service); *Jarvis v. Siemens Med. Solutions USA, Inc.*, 460 F. App'x 851, 857-858 (11th Cir. 2012) (finding that minority plaintiff failed to show that Caucasian coworker qualified as similarly-situated where record showed plaintiff had several significant employment performance deficiencies not seen in Caucasian employee's record).

Plaintiff first points to his subordinate Andrew Herr, who was the employee in whose name Defendant filed the false expense reports at issue. *See* Pl. Resp. [47-1] at 13-15.[2] Herr also left his shift without clocking out on at least four occasions. Pl. SOMF ¶ 8. Herr was initially terminated after being caught for failing to clock out, but his termination was reversed on appeal. Def. SOMF [46-1] ¶ 24. Defendant's discipline of Herr, however, is "apples and oranges" compared to that of Plaintiff. It is undisputed that Herr was a non-managerial technician and that Defendant concluded that Plaintiff, Herr's superior, directed Herr's Mobile overtime records to be falsified for Plaintiff's convenience in processing the reimbursements. *See* Def. SOMF [46-1] ¶ 26.

Generally, a manager is held to higher standards and an employer's decision to discipline a manager more harshly than a subordinate does not in itself imply discrimination. *See, Davis v. Nat'l R.R. Passenger Corp.*, 733 F. Supp. 2d 474, 491 (D. Del. 2010) (Caucasian employee who was not disciplined for sleeping on job, as was African-American employee, was not similarly-situated comparator; Caucasian employee was non-supervisory employee held to lesser standard than plaintiff, who was a supervisor.). Indeed, the material facts indicate that Defendant terminated

---

[2] The Court notes the absence of any admitted material facts indicating Herr's race. The Court, however, assumes that Herr is non-African-American.

Armor for "leadership failure." Def. SOMF [46-1] ¶ 30. There are no facts to suggest that that infraction was a reason for Herr's termination.

That Herr was initially terminated, but then eventually reinstated, for leaving his shift without clocking out on four occasions is also "apples and oranges." There is no indication that this misconduct involved affirmatively altering records, as Defendant believed that Plaintiff was guilty of. Rather, Herr simply neglected to "clock out" during lunch on several occasions: "Mr. Herr left the property without clocking in and out, which is a violation of policy, and was terminated." Christopher Dep. [46-12] at 41. Again, a manager who affirmatively falsified accounting records clearly presents a different disciplinary concern than a technician who omitted to "clock out" on four occasions – or so an employer could reasonably perceive. Moreover, the reason specifically given for overturning Herr's termination on appeal was that "while you did know you were going against timecard policies, your Manager's [i.e., Plaintiff's] actions allowed you to believe it was all right to circumvent certain company policies." Christopher Dep. [46-14] at 29. In other words, Defendant expressly distinguished between the manager whom it believed instigated the wrongdoing on the one hand from the technician who could present the manager's actions as at least a partial defense on the other. The disparate treatment of these two

22

very different employees in different positions and who differed in culpability is therefore not evidence of racial discrimination.

Defendant next points to Gary Oliver, who unlike Herr was also a supervisor, and in fact was a Senior Manager. *See* Pl. Resp. [47-1] at 16. Oliver in his declaration first makes the entirely conclusory statement that "[w]hile I was a Manager and Senior Manager at FedEx it was common practice among management employees to violate/manipulate FedEx policies related to financial expenditures due to the number of rules, the complexity and confusion and the inconsistent application of the rule process, and the desire of employees to accomplish tasks more efficiently." Oliver Decl. [47-4] ¶ 8. This statement, standing alone, fails to establish that any particular employee of any particular race engaged in misconduct similar to that which Defendant believed Plaintiff committed, much less that the same decision makers that disciplined Plaintiff were aware of that other hypothetical employee's conduct and failed to discipline that employee as severely.

Oliver goes on, however, to testify about his own specific misconduct. While he was Senior Manager, he "was accused of violating/manipulating a workplace rule related to financial expenditures," and FedEx determined that he had "allow[ed]" three other employees to file "inaccurate" expense reports and check requests. *Id.* ¶ 11-12. Oliver was demoted, but not terminated. *Id.* ¶ 14. Moreover, Oliver states that the

three other employees who he supposedly "allowed" to file inaccurate reports were themselves Caucasian managers, who were also not terminated. *Id.* ¶¶ 12-13. Plaintiff thus argues, based on the Oliver declaration, that he has presented evidence of four non-African American managers who filed "inaccurate" expense report information or who "allowed" others to do so, but who were not fired for that rules violation. *See* Pl. Resp. [47-1] at 16-17.

The record also reveals significant differences between the Oliver incident and the one that resulted in Plaintiff's termination. Most critically, Plaintiff adduces no proof that Defendant believed that Oliver or the other managers were guilty of intentionally falsifying company accounting records, as it believed Plaintiff had done. Oliver states only that he was found to have "allow[ed]" others to file "inaccurate" reports. Oliver. Decl. [47-4] ¶ 12. This vague statement does not make clear what was "inaccurate," whether the inaccuracies were intentional or mistaken, or whether Oliver "allow[ed]" the "inaccurate" reports by negligence, lack of supervision, or willful misconduct. Indeed, Defendant offers testimony that *none* of the employees in the Oliver incident were believed to have deliberately falsified a company document, and

rather they were believed to have simply incurred expenses without receiving required managerial approval. *See* Def. Reply [51] at 8; Langford Supp. Decl. [52-1] ¶ 8.[3]

Whether this evidence is sufficient to pass muster under the *prima facie* case, which is not intended to be onerous, is ultimately moot in this case. Even if it did establish a *prima facie* case, it is not disputed that Defendant articulates a legitimate, non-discriminatory reason for terminating Plaintiff, namely, his falsification of Herr's time card, something that violated company rules and was considered a "leadership failure" inconsistent with the expectations of a manager. Def. SOMF [46-1] ¶ 30.[4] The burden then shifts back to Plaintiff to establish that these reasons were pretextual, and "he must present 'significantly probative' evidence on the issue to avoid summary judgment." *Young v. Gen. Foods Corp.*, 840 F.2d 825, 829 (11th Cir. 1988) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed.2d 265 (1986)). Plaintiff's showing of pretext relies largely on the same allegations of disparate

---

[3] Oliver also fails to establish a sufficient evidentiary foundation for attesting to what discipline was meted out to the other employees involved in the incident. Oliver, who was also being investigated, was presumably not involved in the decision as to what discipline to impose, and therefore presumably only knows the details of their discipline through inadmissible hearsay – or at least Plaintiff fails to establish otherwise.

[4] *See* Pl. Resp. [47-1] at 18 (not contesting that Defendant has articulated a "legitimate non-discriminatory reason" for termination, but rather arguing that the supposed reason articulated was pretextual).

treatment of the same comparators. Therefore, it is more logical and efficient on the facts of this case to assume–for present purposes–that Plaintiff establishes the lower hurdle of the *prima facie* case, and to proceed to determine whether this evidence satisfies the greater hurdle of constituting "significantly probative" evidence of pretext. *See, e.g., LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 844 (1st Cir. 1993) ("we prefer—because the question is so close—to assume for present purposes that . . . [Plaintiff] did establish a *prima facie* case within the *McDonnell Douglas* formulation."). As explained below, Plaintiff fails to clear that hurdle.

              b.     Pretext

As explained above, Plaintiff bears the burden to rebut Defendant's proffered legitimate, non-discriminatory reason for termination with "significantly probative' evidence on the issue [of pretext]." *Young*, 840 F.2d at 829. Plaintiff in this regard focuses primarily on the fact that Andrew Herr "was rehired despite committing worse offenses" than did Plaintiff. Pl. Resp. [47-1] at 19. For the reasons stated above, however, Herr is not a proper comparator, both in terms of his position and the nature of the wrongdoing for which he was punished. Indeed, Plaintiff's assertion that Herr committed "worse offenses" is simply his opinion. Defendant was entitled to perceive and treat the affirmative falsification of company financial records by a manager as a "worse offense" than a technician's omission to clock out on four occasions. That

Plaintiff disagrees and wishes to litigate the question of whose conduct should have been deemed worse does not create a triable issue of material fact. *See Nix*, 738 F.2d at 1187 (an employer may make an employment decision "for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason."). Thus, even if Defendant's disparate treatment of Herr were enough to satisfy a *prima facie* case – which standing alone it would not given the significant differences in the circumstances – it is not significantly probative evidence on the issue of pretext.[5]

Plaintiff also argues that Defendant unfairly credited Herr's allegations and otherwise came to an unfair decision. Plaintiff complains that Herr "unjustly blamed Plaintiff for his termination," that Defendant "turned a blind eye to Mr. Herr's improper motivations and conveniently ignored Mr. Herr's recent history of dishonesty," that Defendant never questioned "the veracity of the source of accusations" or Plaintiff's repeated statements of innocence, and never considered

---

[5] Plaintiff does not specifically rely on the Oliver incident as evidence of pretext. Even if he did, that incident would not constitute significantly probative evidence of pretext either. As explained above, there exist significant differences with that incident. Plaintiff does not show – and Defendant introduces evidence affirmatively refuting – that Defendant believed Oliver or the others he "allowed" to file "inaccurate" reports to be guilty of intentionally and fraudulently filing falsified financial records. By contrast, Defendant believed that Plaintiff, as a manager, did those more serious things. Treating Defendant more harshly in light of these findings does not show pretext.

Plaintiff's "lack of previous discipline as a mitigating factor." *See* Pl. Resp. [47-1] at 22. These arguments fail because Federal courts "do not sit as a super-personnel department that reexamines an entity's business decisions. No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, the [federal discrimination laws do] not interfere. Rather, our inquiry is limited to whether the employer gave an honest explanation of its behavior." *Elrod v. Sears, Roebuck and Co.*, 939 F.2d 1466, 1470 (11th Cir.1991) (fact that complaining employees may have been "lying through their teeth" as to plaintiff's supposed violations is irrelevant; question is whether supervisors who terminated plaintiff believed him to be guilty of misconduct).

Plaintiff also argues that his "cumulative record was demonstrably and significantly better then Mr. Herr's," and that Plaintiff's "performance reviews were consistently positive." Pl. Resp. [47-1] at 14. This argument fails because Defendant did not claim to terminate Plaintiff on grounds of poor historical work performance. Rather, Defendant terminated Plaintiff for perceived violations of the company's Acceptable Conduct Policy and for leadership failure, *see* Def. SOMF [46-1] ¶ 30, neither of which are contradicted by a history of generally positive performance reviews.

Plaintiff points to his termination letter, which states that he "falsified employee time cards and failed on multiple accounts as a leader," Armor Dep. [46-9] at 12. According to Plaintiff, Defendant has only substantiated one instance of alleged "leadership failure," i.e., the falsification of Herr's reimbursement and time card records, and therefore the reference to "multiple" accounts of leadership failure reveals pretext. *See* Pl. Resp. [47-1] at 20. Plaintiff also states that "there is also no evidence that Defendant had ever before treated a solitary violation of company policy, or specifically a solitary violation of the policy against falsifying company documents, as grounds for termination for managers. *Id.* at 21. None of this is significant evidence of pretext, either. A mere reference to "multiple accounts" is not in itself material to the question at hand, which is whether Defendant's proffered statements were pretext for discrimination. And Plaintiff's reference to "no evidence" of a prior termination is inapposite because it is his burden to adduce evidence of pretext, not Defendant's burden to prove the absence of pretext.[6]

_____

[6] Plaintiff does not adduce competent evidence that no other manager has ever been fired the first time that they falsified company financial records. At most, Plaintiff cites Ugarte's testimony that he has never personally fired a manager before in that circumstance. *See* Pl. Resp. [47-1] at 21 (citing Ugarte Dep. [46-21] at 35) ("have you been involved in terminating any managers when it was their first time violating a FedEx policy? . . . . A: No."). This vague testimony, based on Ugarte's own personal experience, is far from significant evidence of pretext in this case.

Thus, Plaintiff fails to adduce significantly probative evidence of pretext from which a jury could find that he was terminated on grounds of racial discrimination. The undersigned therefore **RECOMMENDS** that Defendant's Motion [46] be **GRANTED** as to Count II.

C.  COUNT I: RACE DISCRIMINATION IN VIOLATION OF SECTION 1981

The standards governing Title VII race discrimination claims apply equally to Section 1981 race discrimination claims. *See Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008); *see also Crawford v. W. Elec. Co., Inc.*, 745 F.2d 1373, 1376 (11th Cir. 1984). For the reasons discussed above as to his Title VII claim, Plaintiff fails to meet the applicable standard. Specifically, Plaintiff fails to point to any similarly-situated individuals outside of his protected class whom Defendant treated better than it did Plaintiff. The undersigned thus **RECOMMENDS** that Defendant's Motion [46] be **GRANTED** as to Plaintiff's Section 1981 race discrimination claim in Count I.

D.  COUNT IV: RETALIATION IN VIOLATION OF TITLE VII

Plaintiff in Count IV alleges that Defendant unlawfully retaliated against him for complaining about racial harassment and racial discrimination. *See* Am. Cmplt. [6] ¶¶ 40-43. Title VII acts to shield employees from retaliation for certain protected practices. The statute provides, in relevant part:

30

It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . for employment . . . because [the employee] has opposed any practice made an unlawful practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).

Proof of retaliation is also governed by the framework of shifting evidentiary burdens established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981). *See Donnellon v. Fruehauf Corp.*, 794 F.2d 598, 600 (11th Cir. 1986); *see also Goldsmith v. City of Atmore*, 996 F.2d 1155, 1162-63 (11th Cir. 1993). In order to prevail, a plaintiff must first establish a *prima facie* case of retaliation. *See Goldsmith*, 996 F.2d at 1162-63; *Donnellon*, 794 F.2d at 600-601; *see also Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1524 (11th Cir. 1991); *Simmons v. Camden Cnty. Bd. of Educ.*, 757 F.2d 1187, 1189 (11th Cir. 1985). Once a plaintiff establishes a *prima facie* case, the employer must come forward with a legitimate non-discriminatory reason for its action. *See Goldsmith*, 996 F.2d at 1162-63; *Donnellon*, 794 F.2d at 600-601; *see also Weaver*, 922 F.2d at 1525-1526. Just as with the discrimination claims discussed above, if the employer carries its burden of production to show a legitimate reason for its action, the plaintiff then bears the burden of proving by a preponderance of the evidence that

31

the reason offered by the defendant is merely a pretext for discrimination. *Goldsmith*, 996 F.2d at 1162-63; *Donnellon*, 794 F.2d at 600-601.

           1.    *Prima Facie* Case

To establish a *prima facie* case of illegal retaliation under 42 U.S.C. § 2000e-3(a), Plaintiff must show that: (1) he engaged in a protected activity or expression; (2) he received an adverse employment action, and (3) there was a causal link between the protected expression and the adverse action. *See, e.g., Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1454 (11th Cir. 1998); *Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1524 (11th Cir. 1991); *Simmons v. Camden Cnty. Bd. of Educ.*, 757 F.2d 1187, 1189 (11th Cir. 1985).

           2.    Causal Connection

Defendant concedes that Plaintiff fulfills the first two elements. *See* Def. Brf. [46-2] at 6. Defendant, however, argues that Plaintiff cannot fulfill the third element of causal connection. The Court agrees.

To establish a causal connection, Plaintiff was traditionally required to show that the relevant decision maker was aware of Plaintiff's protected conduct, and that the protected activity and the adverse action "were not wholly unrelated." *Shannon v. BellSouth Telecommunications, Inc.*, 292 F.3d 712, 716 (11th Cir. 2002) (internal citation and quotations omitted). The Supreme Court, however, recently ruled that

32

"Title VII retaliation claims must be proved according to traditional principles of but-for causation . . ." *Univ. of Texas S.W. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013). This standard "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Id*.

Plaintiff cannot establish a causal connection under either of these standards. Plaintiff first complained of discrimination by an employee of contractor Pegasus in late April 2009, then filed an internal complaint of race discrimination against FedEx Managing Director Scott Ogden on May 4, 2009. Def. SOMF [46-1] ¶¶ 16, 18. Defendant terminated Plaintiff on May 27, 2010. *Id*. ¶ 31. Thus, almost 54 weeks – over twelve months – passed between Plaintiff's most recent protected activity and the adverse action he suffered. This major temporal gap between the protected activity and the adverse action suffered significantly undermines any claim of causation. *See Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) ("[I]in the absence of other evidence tending to show causation, if there is a substantial delay between the protected expression and the adverse action, the complaint of retaliation fails as a matter of law."); *Maniccia v. Brown*, 171 F.3d 1364, 1370 11th Cir. 1999 ("The more than 15-month period that elapsed between Appellant's grievance and the alleged adverse employment actions belies her assertion that the former caused the latter. *See, e.g., O'Connor v. Chicago Transit Auth.*, 985 F.2d 1362, 1370 (7th

Cir.1993) (9-month gap between protected activity and adverse employment action precluded reasonable inference of causation); *Causey v. Balog*, 162 F.3d 795, 803 (4th Cir.1998) (13-month delay between protected activity and termination too long for causation to be established) . . ."); *Conner v. Schnuck Markets, Inc.*, 121 F.3d 1390, 1395 (10th Cir.1997) (4-month lag between protected activity and termination not sufficient to justify an inference of causation).

Plaintiff's only specific argument as to causation is that "Peggy Langford and Greg Hall were aware of Plaintiff's protected activity at the time of agreeing with management's decision to terminate Plaintiff." Pl. Resp. [47-1] at 24. But it is undisputed that Peggy Langford, the Human Resources advisor, simply "concurred" in the decision actually made by Christopher to terminate Plaintiff. *See* Def. SOMF [46-1] ¶ 30. That this one employee, who simply "concurred" in a decision made and upheld by others, was "aware" of Plaintiff's protected activity over a year previously, does not constitute evidence of causation, particularly under a "but for" standard. As for Greg Hall, while Plaintiff believes that he was involved in investigating Plaintiff's 2009 race discrimination claim, *see* Pl. SOMF [47-3] ¶ 19, he cites no competent evidence to support that assertion.[7] Defendant refutes that assertion. Defendant

---

[7] Plaintiff testified that "obviously or it is pretty obvious to me that the vice president would talk to his reports about the issues that are going on in the organization," but then admitted that he lacked any specific information in this regard.

produces testimony from Ms. Langford that she never disclosed Plaintiff's EEO complaint to Christopher, Ugarte or Hall, as they were not within the group of individuals with need to know about the complaint, and she was obliged by FedEx policy to keep the matter confidential. *See* Langford Decl. [46-25] ¶ 7.[8]

Plaintiff thus fails to show evidence of a causal link between his protected activity and his termination and he fails to establish a *prima facie* case.

### 3. Pretext

Regardless, even if Plaintiff established a *prima facie* case, it remains that Defendant has proffered a legitimate, non-discriminatory reason for his dismissal, as discussed in detail above. Thus, for all the reasons explained in connection with Counts I and II, Plaintiff fails to adduce significantly probative evidence that these

---

Armor Dep. [46-4] at 304. Plaintiff also testified that he was told by another employee that Hall had secretly "ordered me investigated after I terminated Pegasus" in or around March 2009. *Id.* at 149. Nothing about this hearsay statement establishes that Hall was aware of the separate discrimination complaint that Plaintiff made regarding Pegasus.

[8] In his response to Defendant's Statement of Undisputed Facts, but not in his brief, Plaintiff states that he "believes" Ugarte and Christopher also knew about his protected activity. *See* Pl. Resp. [47-2] ¶ 23. The testimony Plaintiff cites in support, Armor Dep. [46-4] at 301-303, makes clear that this is based on nothing more than sheer speculation, e.g., "obviously or it is pretty obvious to me that the vice president would talk to his reports about the issues that are going on in the organization." This assumption and speculation are not sufficient to adduce a material issue of fact.

proffered reasons were a pretext for unlawful retaliation. Defendant's Motion [46] should therefore be **GRANTED** as to Count IV.

E.      COUNT III: RETALIATION IN VIOLATION OF SECTION 1981

Although the Eleventh Circuit has held that the elements of a claim of race discrimination under Title VII and Section 1981 are the same, it is not entirely clear that a claim of retaliation under Section 1981 is analyzed exactly the same as a claim brought under Title VII. *See Olmstead v. Taco Bell Corp.*, 141 F.3d 1457, 1463 n.4 (11th Cir. 1998) ("the scope of relief available under § 1981 with respect to retaliation claims appears to remain largely an open question in this circuit."); *see also Tucker v. Talladega City Sch.*, 171 F. App'x 289, 294, 2006 WL 688967 (11th Cir. 2006) (unpublished) ("[t]his Court has recognized that § 1981 includes a cause of action for retaliation, but the elements of a claim for retaliation under § 1981 are not settled," (citing *Andrews v. Lakeshore Rehab. Hosp.*, 140 F.3d 1405, 1412-13 (11th Cir. 1998) and *Bass v. Bd. of Cnty. Comm'rs*, 256 F.3d 1095, 1120 n. 10 (11th Cir. 2001) ("whether the elements of Title VII and § 1981 retaliation claims are the same is an 'open question' in this Circuit.")). Nevertheless, because neither party has argued that the Court should apply a different standard, the Court will assume *arguendo* that the elements of Plaintiff's claim of retaliation under Section 1981 are the same as those for her claim of retaliation brought under Title VII. For the reasons stated above, the

36

undersigned **RECOMMENDS** that Defendant's Motion [46] be **GRANTED** as to Count III.

### III.   CONCLUSION AND RECOMMENDATION

For the above reasons, the undersigned **RECOMMENDS** that Defendant's Motion for Summary Judgment [46] be **GRANTED** as to all four Counts in Plaintiff's Amended Complaint [6], and that judgment be entered in favor of Defendant.

As this is a Final Report and Recommendation, there is nothing further in this action pending before the undersigned. Accordingly, the Clerk is **DIRECTED** to terminate the reference of this matter to the undersigned.

**IT IS SO RECOMMENDED** this 9th day of June, 2014.

JUSTIN S. ANAND
UNITED STATES MAGISTRATE JUDGE